## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| PASQUALE T. DEON, SR., and MAGGIE HARDY MAGERKO<br><br>Plaintiffs,<br><br>v.<br><br>DAVID M. BARASCH, KEVIN F. O'TOOLE, RICHARD G. JEWELL, SEAN LOGAN, KATHY M. MANDERINO, MERRITT C. REITZEL, WILLIAM H. RYAN, JR., and DANTE SANTONI JR., Members of the Pennsylvania Gaming Control Board, in their official capacities; PAUL MAURO, Director of the Pennsylvania Gaming Control Board's Bureau of Investigation and Enforcement, in his official capacity; CYRUS PITRE, Director of the Pennsylvania Gaming Control Board's Office of Enforcement Counsel, in his official capacity; and JOSH SHAPIRO, Attorney General of Pennsylvania, in his official capacity.<br><br>Defendants. | Civil Action No.:  17-cv-1454-SHR<br><br>(Electronically Filed) |

## FIRST AMENDED COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Pasquale "Pat" T. Deon, Sr. and Maggie Hardy Magerko bring this complaint for declaratory and injunctive relief against the defendants in their official capacities, to prevent the unconstitutional enforcement of the unlawful and

discriminatory restraints on freedom of speech that are contained in § 1513 of the Pennsylvania Gaming Act, 4 Pa. Cons. Stat. § 1513 (the "Gaming Act").

## Overview

1.      Section 1513 of the Gaming Act imposes an absolute ban on political contributions from an inappropriately targeted class of persons affiliated with licensed gaming.

2.      The ban on contributions is vast in scope.  It targets licensees and applicants for licenses to operate slot machine facilities; key employees of applicants and licensees; and owners, shareholders, and principals of applicants and licensees.  It is not limited to Pennsylvania citizens.  With respect to Pennsylvania elected officials, the Gaming Act forbids anyone in these classes from contributing to any political candidate, political party, or any "other political committee" in Pennsylvania.  It includes a complete ban on direct contributions as well as contributions to independent expenditure groups.  It even forbids payment of any "debts incurred by or for a candidate ... before or after any election," regardless of whether the debt served a political purpose.

3.      Penalties for violating § 1513 include fines of hundreds of thousands of dollars or more, suspension or revocation of the violator's gaming license, and misdemeanor prosecution.

4.      The ban on contributions is unconstitutional.  It regulates and abridges speech.  It abridges content.  It is a form of viewpoint discrimination.  It targets a specific class of individuals.  It is neither narrowly tailored nor closely drawn.  It

serves no legitimate government interest.  It cannot survive under any standard of scrutiny.

5.     Mr. Deon and Ms. Magerko seek an order declaring that the ban set forth in § 1513 is unconstitutional, both facially and as applied to each of them. The ban is an overbroad and unlawfully discriminatory infringement of their rights of free expression, free association, and equal protection guaranteed by the First and Fourteenth Amendments to the Constitution of the United States.[1]

### Jurisdiction and Venue

6.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331.  Mr. Deon's and Ms. Magerko's claims arise under the First and Fourteenth Amendments to the Constitution of the United States and seek to invalidate certain Pennsylvania provisions under the authority of the federal Supremacy Clause.  This Court also has jurisdiction under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, and the Civil Rights Act, 42 U.S.C. § 1983.

7.     This Court's jurisdiction is properly exercised over the defendants in their official capacities pursuant to *Ex parte Young*, 209 U.S. 123 (1908).

8.     This Court additionally has jurisdiction and discretion to award attorneys' fees.  42 U.S.C. § 1988(b) (2017).

---

[1] Mr. Deon and Ms. Magerko separately reserve all rights to challenge the lawfulness of § 1513 under the Pennsylvania Constitution in the Pennsylvania Supreme Court.  This Complaint is limited to their federal challenges and does not raise state law issues.

9.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1)-(2).  The defendants are considered to reside in the Middle District of Pennsylvania because this is where they perform their official duties.  28 U.S.C. § 1391(b) (2017); *Taylor v. White*, 132 F.R.D. 636, 640 (E.D. Pa. 1990).

## The Parties

10.     Plaintiff Pat Deon is a shareholder of Sands Pennsylvania Inc., a holding company with a 90 percent interest in Sands Bethworks Gaming LLC ("SBG").  SBG is a privately held gaming business licensed under the Gaming Act.

11.     In December 2005, SBG applied to the Board for a Category 2 slot machine license for the Sands Casino Resort in Bethlehem, Pennsylvania.  On December 20, 2006, the Board approved SBG's application for a Category 2 slot machine license.

12.     In conjunction with SBG's application, Mr. Deon applied to the Gaming Board for a gaming license as a "key employee qualifier" of SBG.[2]

13.     As a gaming-license applicant, licensee, and key employee qualifier/principal of a slot machine licensee, Mr. Deon falls within the class of persons prohibited from making political contributions under the Gaming Act.  He

---

[2] The Gaming Act was amended effective November 1, 2006.  The amendments, along with subsequent revisions to the Pennsylvania Code, had the effect of changing the terminology used to describe an individual holding an indirect ownership interest in a license applicant from "key employee qualifier" to "principal."  *See* 2006 Pa. Legis. Serv. Act 2006-135 (S.B. 862) (Nov. 1, 2006); 37 Pa. Bull. 2808 (June 23, 2007) ("The term 'key employee qualifier' has also been deleted; it was replaced with the term 'principal'").

is subject to the Gaming Act's enforcement provisions.   4 Pa. Cons. Stat. § 1513(a) (2017).

14.     Additionally, because Mr. Deon holds a "controlling interest" in SBG, any violation of the Act would subject him to the penalties set forth in § 1513(c). The definition of "controlling interest" for privately held entities is "the holding of *any* securities in the legal entity."   4 Pa. Cons. Stat. § 1103 (2017) (emphasis added).   Under this definition, there is no ownership threshold.  *See, e.g.*, *DePaul v. Commonwealth*, 600 Pa. 573, 577 n.4, 969 A.2d 536, 538 n.4 (2009) ("The Office of the Attorney General asserts that this 9.54% interest is a controlling rather than an indirect interest").

15.     Plaintiff Maggie Hardy Magerko is the beneficiary of a trust, which trust is the owner of Nemacolin Woodlands Inc. ("Nemacolin").   In turn, Nemacolin owns Woodlands Fayette, LLC ("Woodlands Fayette"), which is a privately held gaming business licensed under the Gaming Act.   Section 1325(d)(1) of the Gaming Act requires every beneficiary of a trust that holds a beneficial interest in a licensed entity to also be licensed as a principal.  4 Pa. Cons. Stat. § 1325(d)(1) (2017).  The Gaming Act therefore requires Ms. Magerko to be a licensee.

16.     Woodlands Fayette applied to the Board for a Category 3 slot machine license in 2009.   On April 14, 2011, the Board approved Woodlands Fayette's application for a Category 3 slot machine license.

17.     There was a subsequent appeal of the award of license.  On January 22, 2012, the Pennsylvania Supreme Court confirmed the award of the Category 3 slot machine license.

18.     There were no additional licenses sought.   Woodlands Fayette renewed its Category 3 slot machine license on December 14, 2016. That license is not set to expire until December 13, 2019.

19.     In conjunction with Woodlands Fayette's application, Ms. Magerko applied to the Gaming Board for a gaming license as a "key employee qualifier" of Woodlands Fayette.

20.     As a gaming-license applicant, licensee, and key employee qualifier/principal of a slot machine licensee, Ms. Magerko falls within the class of persons prohibited from making political contributions under the Gaming Act.  She is subject to the Gaming Act's enforcement provisions.  4 Pa. Cons. Stat. § 1513(a) (2017).

21.     Similar to Mr. Deon, because Ms. Magerko's 2001 trust owns Nemacolin, which in turn owns Woodlands Fayette, any violation of the Act would subject her to the penalties set forth in section 1513(c).

22.     The penalties section further provides that "any individual who makes a contribution in violation of this section commits a misdemeanor of the third degree."  4 Pa. Cons. Stat. § 1513(c) (2017).

23.     Mr. Deon and Ms. Magerko are engaged citizens who have contributed to their communities in various capacities.

24.     Mr. Deon has served the people of Pennsylvania in various capacities over the last two decades.  He has been the Secretary and Treasurer of the Pennsylvania Turnpike Commission since 2002.  He has also been the Chairman of the Southeastern Pennsylvania Transportation Authority since 1999.

25.     Mr. Deon consistently contributed in support of candidates for public office in the Commonwealth since 1978.  Starting in 2005, Mr. Deon has refrained from making political contributions to such candidates, to conform to the ban in § 1513.[3]

26.     Ms. Magerko has been the owner and president of the 84 Lumber Company since 1992. Under her leadership, 84 Lumber became a nationally certified Women's Business Enterprise National Council (WBENC) company.  As previously stated, Ms. Magerko is also the owner of Nemacolin.

27.     Ms. Magerko had consistently contributed in support of candidates for public office in the Commonwealth.  Starting in 2009, Ms. Magerko has refrained from making political contributions to such candidates, to conform to the ban in section 1513.[4]

_____

[3] In 2009, after the Pennsylvania Supreme Court found § 1513 unconstitutional and enjoined its enforcement (as described below), Mr. Deon made a single political contribution.  After the General Assembly amended the Gaming Act in 2010, Mr. Deon again ceased making political contributions.

[4] A prior submittal for a gaming license was applied for and withdrawn.  When that application was submitted, Ms. Magerko refrained from making any political contributions until the time at which the application was withdrawn from consideration.  She has made no contributions since Woodlands Fayette submitted its application that was approved in January 2012.

28.     Mr. Deon and Ms. Magerko desire to make political contributions to various candidates and organizations in the Commonwealth.  Section 1513 violates their constitutional rights by prohibiting them from doing so.

29.     The penalties section further makes such constitutionally protected contributions a misdemeanor offense if Mr. Deon or Ms. Magerko exercise their protected right to so contribute.  4 Pa. Cons. Stat. §1513(c) (2017).

30.     Defendants David M. Barasch, Richard G. Jewell, Sean Logan, Kathy M. Manderino, Merritt C. Reitzel, William H. Ryan, Jr., and Dante Santoni Jr. are members of the Pennsylvania Gaming Control Board.

31.     Defendant Kevin F. O'Toole is the Executive Director of the Pennsylvania Gaming Control Board.

32.     Defendant Paul Mauro is the Director of the Pennsylvania Gaming Control Board's Bureau of Investigation and Enforcement ("BIE").

33.     Defendant Cyrus Pitre is the Director of the Pennsylvania Gaming Control Board's Office of Enforcement Counsel.

34.     Defendant Josh Shapiro is the Attorney General of the Commonwealth of Pennsylvania.

35.     The defendants are charged with enforcing the provisions of the Gaming Act challenged by this action.  The defendants have the authority under the Gaming Act to investigate, prosecute, enjoin, fine, and otherwise penalize the plaintiffs, and others similarly situated, for exercising their constitutional rights to free speech under the First and Fourteenth Amendments to the Constitution of the United States.

36.    Further, the defendants are effectively charged to discriminate against the plaintiffs, and others similarly situated, on the basis of their affiliation with a particular industry, in violation of their right to equal protection under the Fourteenth Amendment to the Constitution of the United States.

37.    In all these actions, the defendants are charged to act—and would continue to act if not enjoined—under color of state law.

38.    Mr. Deon and Ms. Magerko sue the defendants here in their official capacities to prevent violations of the Constitution of the United States.

## The Gaming Act

### A.    The Gaming Act as Initially Adopted

39.    Pennsylvania's General Assembly passed the Gaming Act in 2004. The Act established a regulatory framework to govern legalized slot-machine gaming in Pennsylvania, to manage and monitor the industry's impact on its citizens and economy, and to scrutinize the conduct of licensed gaming throughout the Commonwealth.

40.    The Gaming Act established the seven-member Gaming Control Board as the independent agency responsible for applying this regulatory framework.  The Board comprises three members appointed by the Governor of Pennsylvania and four members appointed by the leadership of the Pennsylvania House of Representatives and Senate.  4 Pa. Cons. Stat. § 1201(b) (2017).

41.    The Gaming Act also establishes the BIE, within the Gaming Board. The BIE is an independent body responsible for enforcing the Gaming Act's provisions, investigating and reviewing applicants and applications for licenses,

investigating licensees for violations of the Gaming Act, and other duties.  4 Pa.
Cons. Stat. § 1517 (2017).

42.    Under the Gaming Act, persons or entities may apply to the Gaming
Board for a slot machine license and, upon issuance of a license by the Board, may
place and operate slot machines at a licensed facility.  4 Pa. Cons. Stat. § 1301
(2017).  In connection with these applications, the applicant's "key employees,"
and any "principals" of applicant organizations, must apply for a "key employee
license" or a "principal license," and undergo rigorous scrutiny of their personal,
professional, and financial backgrounds.  4 Pa. Cons. Stat. §§ 1311.1(a)-(b),
1311.2(a)-(b) (2017).

43.    In the most pertinent part, § 1513 of the Gaming Act prohibits license
holders, license applicants, and other gaming entities from making any political
contributions of any size.  It provides:

**§ 1513. Political influence.**

(a)  **Contribution restriction.**—The following
persons shall be prohibited from contributing any money
or in-kind contribution to a candidate for nomination or
election to any public office in this Commonwealth, or to
any political party committee or other political committee
in this Commonwealth or to any group, committee or
association organized in support of a candidate, political
party committee or other political committee in this
Commonwealth:

(1) An applicant for a slot machine license,
manufacturer license, supplier license, principal
license, key employee license or horse or harness
racing license.

(2) A slot machine licensee, licensed manufacturer, licensed supplier or licensed racing entity.

(3) A licensed principal or licensed key employee of a slot machine licensee, licensed manufacturer, licensed supplier or licensed racing entity.

(4) An affiliate, intermediary, subsidiary or holding company of a slot machine licensee, licensed manufacturer, licensed supplier or licensed racing entity.

(5) A licensed principal or licensed key employee of an affiliate, intermediary, subsidiary or holding company of a slot machine licensee, licensed manufacturer, licensed supplier or licensed racing entity.

(6) A person who holds a similar gaming license in another jurisdiction and the affiliates, intermediaries, subsidiaries, holding companies, principals or key employees thereof.

**(a.1) Contributions to certain associations and organizations barred.**—The individuals prohibited from making political contributions under subsection (a) shall not make a political contribution of money or an in-kind contribution to any association or organization, including a nonprofit organization, that has been solicited by, or knowing that the contribution or a portion thereof will be contributed to, the elected official, executive-level public employee or candidate for nomination or election to a public office in this Commonwealth.

44.   Subsection (d) of § 1513 defines "contribution" broadly:

Any payment, gift, subscription, assessment, contract, payment for services, dues, loan, forbearance, advance or deposit of money or any valuable thing made to a candidate or political committee for the purpose of influencing any election in this Commonwealth or for paying debts incurred by or for a candidate or committee

> before or after any election. The term shall include the
> purchase of tickets for events including dinners,
> luncheons, rallies and other fundraising events; the
> granting of discounts or rebates not available to the
> general public; or the granting of discounts or rebates by
> television and radio stations and newspapers not
> extended on an equal basis to all candidates for the same
> office; and any payments provided for the benefit of any
> candidate, including payments for the services of a
> person serving as an agent of a candidate or committee
> by a person other than the candidate or committee or
> person whose expenditures the candidate or committee
> must report. The term also includes any receipt or use of
> anything of value received by a political committee from
> another political committee and also includes any return
> on investments by a political committee.

45.     The BIE is responsible for enforcing these provisions.  The Office of

Enforcement Counsel, created within the BIE, is additionally empowered to initiate

proceedings for noncriminal violations of the ban under § 1517.  Pennsylvania's

Attorney General may institute criminal proceedings for violations of the

contribution ban specifically under section 1517(c.1).

46.     The ban in § 1513 was first adopted on July 5, 2004.  As initially

adopted, § 1513 was accompanied by a statement of "Legislative Intent" at § 1102

of the Gaming Act, which provided:

> It is necessary to maintain the integrity of the regulatory
> control and legislative oversight over the operation of
> slot machines in this Commonwealth; to prevent the
> actual or appearance of corruption that may result from
> *large campaign contributions*; ensure the bipartisan
> administration of this part; and avoid actions that may
> erode public confidence in the system of representative
> government.  (Emphasis added.)

47.    Before the Gaming Act's initial enactment, the General Assembly never investigated whether the licensed gaming industry in Pennsylvania (the operations of which are highly regulated and subject to exacting financial and operational scrutiny) posed any particular risk of political corruption.  The General Assembly adopted § 1513's absolute ban without adducing any evidence that licensed gaming in Pennsylvania is connected to political corruption via contributions to candidates for political office.

**B.    The *DePaul* Decision**

48.    Section 1513 remained in force and unchallenged for nearly four years.  But in *DePaul*, the Pennsylvania Supreme Court invalidated the Gaming Act's contributions ban, and enjoined its enforcement, as a violation of the rights of free expression and association guaranteed by the Pennsylvania Constitution. That case did not address the ban's lawfulness under the Constitution of the United States.

49.    Petitioner DePaul challenged § 1513, claiming it violated multiple provisions under the Declaration of Rights in Article 1 of the Pennsylvania Constitution:  § 7 (freedom of press and speech), § 20 (right of petition), § 26 (no discrimination by Commonwealth and its political subdivisions), and the overarching principles of freedom in § 1.  The Pennsylvania Supreme Court found it necessary to address only one of those grounds—that § 1513 violated the Pennsylvania Constitution's guaranteed freedom of speech.  Pa. Const. art. I, § 7; *DePaul*, 600 Pa. at 576, 969 A.2d at 538.

50.    In striking down § 1513 under the Pennsylvania Constitution, the Pennsylvania Supreme Court held that the ban was overbroad because it prohibited *all* contributions.   The Gaming Act's statement of legislative intent had only provided that the statute was necessary "to prevent the actual or appearance of corruption that may result from *large* campaign contributions."   4 Pa. Cons. Stat. § 1102 (2004) (emphasis added).

## C.    The "Amended" Gaming Act

51.    The Pennsylvania General Assembly reintroduced § 1513's absolute ban on political contributions less than one year after the *DePaul* decision.

52.    The General Assembly merely amended the statement of purpose by removing the reference to "large contributions" and adding that "[b]anning all types of political campaign contributions by certain persons subject to [the Gaming Act] is necessary to prevent corruption and the appearance of corruption that may arise when political campaign contributions and gaming … are intermingled."   4 Pa. Cons. Stat. § 1102 (2017).

53.    The supposedly revised statute still banned political contributions in their entirety.   The amended version did not otherwise alter the types of contributions prohibited under § 1513.  It likewise made no other relevant changes, including with respect to its enforcement provisions.

54.    The General Assembly again made no findings of corruption connected with political contributions from the gaming industry.  Nor did it issue any statement of legislative findings of corruption.

55.     The Governor signed the materially unchanged ban back into law on January 7, 2010.

## Constitutional Principles

56.     The Supremacy Clause establishes federal law as the supreme law of the land, superseding any contravening state law.  U.S. Const. art. VI, cl. 2; *Garner v. Teamsters Local Union No. 776*, 346 U.S. 485, 501 (1953).

### A.     Freedom of Speech

57.     The First Amendment to the Constitution of the United States forbids the passage of any law "abridging the freedom of speech."  U.S. Const. amend. I. All First Amendment rights were incorporated against the states by the Due Process Clause of the Fourteenth Amendment.  *Schneider v. New Jersey, Town of Irvington*, 308 U.S. 147, 160 (1939).

58.     Making a political contribution is long established to be a form of speech and association protected by the First Amendment.  "A contribution serves as a general expression of support for the candidate and his views."  *Buckley v. Valeo*, 424 U.S. 1, 21 (1976).  "[B]anning political contributions muzzles political voices."  *Phila. Fire Fighters' Union Local 22, AFL-CIO v. City of Philadelphia*, 286 F. Supp. 2d 476, 483 (E.D. Pa. 2003).

59.     A "restriction on the amount of money a person or group can spend on political communication … necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached."  *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339 (2010) (internal quotations omitted).  The First Amendment "generally

prohibits suppression of political speech based on the speaker's identity." *Id.* at 350. It forbids "government efforts to increase the speech of some at the expense of others outside the campaign finance context." *Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 741 (2011); *see also*, *e.g.*, *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 20 (1986); *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974).

60.    An "asymmetrical" or "discriminatory" contribution limit triggers strict scrutiny under the First Amendment. *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 740 (2008). In a similar way, a restriction on "independent expenditures" must be "narrowly tailored" to serve a "compelling government interest." *McCutcheon v. Fed. Election Comm'n*, 134 S. Ct. 1434, 1444 (2014); *Citizens United*, 558 U.S. at 340; *Buckley*, 424 U.S. at 16.

61.    Even apart from asymmetrical or discriminatory contribution limits, any restriction on campaign contributions must be at least "closely drawn" to address a "sufficiently important [government] interest." *McCutcheon*, 134 S. Ct. at 1444 (plurality op.) (quoting *Buckley*, 424 U.S. at 25). In that sense, the actual scope of any limit must be proportionate to the government's interest. *Randall v. Sorrell*, 548 U.S. 230, 249 (2006) (plurality op.). It may not be "too low" or "too strict." *Id.* at 248.

62.    The only governmental interest that can sustain any kind of limitation on individual contributions "*must* be limited to a specific kind of corruption—*quid pro quo* corruption—in order to ensure that the Government's efforts do not have the effect of restricting the First Amendment right of citizens to choose who shall

govern them." *McCutcheon*, 134 S. Ct. at 1462 (emphasis added).  Such *quid pro quo* corruption arises only when money is spent "in connection with an effort to control the exercise of an officeholder's official duties."  *Id.* at 1438.  Given such narrow grounds for restricting speech, "the Government *may not* seek to limit the appearance of mere influence or access" to the political system.  *Id.* at 1451 (emphasis added).

63.    Section 1513 is subject to "strict scrutiny" under the First Amendment because its ban on contributions is asymmetrical and discriminatory.  Individuals outside the gaming industry may make unlimited contributions in Pennsylvania, but those within the gaming industry may not make any contributions at all.  It also draws speaker-based distinctions.  It allows some speakers (those unaffiliated with the gaming industry) to make unlimited contributions, but prohibits other speakers (those affiliated with the gaming industry) from making any contributions.   It likewise bans contributions to independent expenditure groups.

64.    At a minimum, § 1513 is subject to "closely drawn" scrutiny under the First Amendment.  Across-the-board contribution limits are generally reviewed to determine whether they are "closely drawn" to a "sufficiently important" interest.  *Buckley*, 424 U.S. at 26-27.  The discriminatory contribution ban here must satisfy at least that standard of review.

**B.    The Equal Protection Clause**

65.    The Fourteenth Amendment to the United States Constitution guarantees to all citizens "equal protection of the laws." It forbids a state government from denying that protection "to any person within its jurisdiction."

U.S. Const. amend. XIV.   At a minimum, it forbids state governments from engaging in arbitrary discrimination against its citizens.

66.   The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike."   *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).   This concept of "equal protection" is the inviolate essence of the rule of law.   *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

67.   Distinctions "affecting fundamental rights" trigger strict scrutiny under the Equal Protection Clause, even if the distinctions do not themselves constitute suspect or invidious classifications.   *Clark v. Jeter*, 486 U.S. 456, 461 (1988).   Making political contributions is "[one] of the most fundamental" rights protected by the First Amendment, *McCutcheon*, 134 S. Ct. at 1463, and "implicate[s] fundamental First Amendment interests," *Buckley*, 424 U.S. at 23. "The Equal Protection Clause requires that statutes affecting First Amendment interests be narrowly tailored to their legitimate objectives."   *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 101 (1972).

68.   Section 1513 is subject to strict scrutiny because it draws distinctions with respect to the fundamental right to make contributions, allowing some people to exercise the right without limit while prohibiting others from exercising it at all.

## The Unconstitutionality of Section 1513

69.   Section 1513 of the Gaming Act is subject to strict scrutiny under both the First Amendment and the Equal Protection Clause.   At a minimum, it is subject to "closely drawn" scrutiny.   But whatever level is applied, § 1513 fails strict

scrutiny, "heightened" scrutiny, "closely drawn" scrutiny, and any other level of scrutiny.

70.     Section 1513 impermissibly discriminates against gaming entities and people in the gaming industry.

71.     Section 1513 impermissibly imposes a total ban on contributions.

72.     Section 1513 is not proportionate to any government interest.  It fails to pursue any legitimate interest at all.  As explained, the only interest that can justify a campaign-finance restriction would be to prevent "*quid pro quo* corruption." *McCutcheon*, 134 S. Ct. at 1451.  But § 1513 fails to pursue that objective.  Pennsylvania can neither demonstrate nor even plausibly assert that contributions create the reality or appearance of corruption, when it authorizes unlimited contributions from people outside the gaming industry.  It is implausible to suggest that even a small contribution from a person affiliated with the gaming industry would create the reality or appearance of corruption.

73.     Section 1513 is unduly broad and is not appropriately tailored to the objective of preventing corruption or its appearance:    (i) the ban covers contributions to groups that make only independent expenditures, even though independent expenditures pose no risk of corruption; (ii) the ban covers contributions to political parties and political action committees, even though contributions to such entities pose little risk of corruption; (iii) the ban covers contributions by certain employees of gaming businesses, even though contributions by such employees again pose little risk of corruption; and (iv) the ban covers contributions by out-of-state entities, which hold gaming licenses in

other states but not Pennsylvania, even though such entities are not operating in Pennsylvania or regulated by Pennsylvania lawmakers and thus have no reason or opportunity to enter into *quid pro quo* agreements with those lawmakers.

74.    Section 1513 fails even rational-basis review.  There is no rational justification for imposing a total ban on contributions from people in the gaming industry while simultaneously allowing unlimited contributions from people outside the gaming industry.

75.    Other courts have invalidated similar restrictions on political speech. For example, in *Ball v. Madigan*, No. 15-C-10441, 2017 WL 1105447 (N.D. Ill. Mar. 24, 2017), the court held unconstitutional Illinois's prohibition of campaign contributions from medical cannabis organizations.  Reviewing under the less rigorous "intermediate standard," the court held that the statute was "plainly disproportional to the government's interest in preventing *quid pro quo* corruption or its appearance."  *Id.* at *6.  The court's reasons—that it was an outright ban and that it singled out one industry—are directly applicable here and confirm the unconstitutionality of § 1513.

76.    Moreover, every federal court of appeals that has examined state laws limiting contributions to independent-expenditure groups has struck down such laws down.  *Republican Party v. King*, 741 F.3d 1089 (10th Cir. 2013); *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483 (2d Cir. 2013); *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535 (5th Cir. 2013); *Wis. Right to Life State PAC v. Barland*, 664 F.3d 139 (7th Cir. 2011); *Long Beach Area Chamber of Commerce v. City of Long Beach*, 603 F.3d 684 (9th Cir. 2010); *SpeechNow.org v.*

*Fed. Election Comm'n*, 599 F.3d 686 (D.C. Cir. 2010); *see also N.C. Right to Life, Inc. v. Leake*, 525 F.3d 274 (4th Cir. 2008) (holding—even before the issuance of *Citizens United*—that a state law limiting contributions could not be applied constitutionally to independent-expenditure committees).

77.    The ban in § 1513 restricts its intended targets from actively participating in our democratic processes while doing nothing to enhance the Gaming Act's comprehensive regulatory safeguards, as enforced by the Gaming Board.

### The Harm to Plaintiffs Deon and Magerko

78.    Suppression of political speech "based on the speaker's identity" is precisely what the General Assembly aimed to achieve. *Citizens United*, 558 U.S. at 350.  It "is an outright ban, backed by criminal sanctions," targeting members of the gaming industry. *Id.* at 337.

79.    For instance, in addition to the risk of massive fines, § 1513 imposes misdemeanor criminal liability on any licensee or applicant for a gaming license, or any "key employee" or "principal" of a licensee or applicant for a license, who makes any political contribution.

80.    Section 1513's "purpose and effect are to silence entities whose voices the Government deems to be suspect." *Id.* at 339.

81.    Section 1513 deprives the potential contributor of one aspect of the "'freedom of political association,' namely, the contributor's ability to support a favored candidate." *Randall v. Sorrell*, 548 U.S. at 246.  It thus muzzles the

"symbolic expression of support evidenced by a contribution" regardless of contribution amount. *Id.* at 247.

82.    By prohibiting political contributions from key employees in the gaming industry, and the shareholders or owners of applicants and licensees, the ban denies such persons their constitutional right to participate in the political process.

83.    Through § 1513, Pennsylvania is unconstitutionally hostile to speech from individuals associated with the gaming industry and has made such speech a crime.

84.    Mr. Deon and Ms. Magerko currently wish to make political contributions to various candidates, organizations, and causes in Pennsylvania. But the provisions of § 1513 of the Gaming Act, and the fear of prosecution under that law, prevent them from doing so.

85.    The chilling effect on Mr. Deon's and Ms. Magerko's exercise of their First and Fourteenth Amendment rights is an actual, immediate, and ongoing constitutional injury.

86.    Plaintiffs have no adequate remedy at law to secure his constitutional rights.

87.    Mr. Deon and Ms. Magerko suffer, and will continue to suffer, irreparable harm to his constitutional rights under § 1513 unless and until § 1513 is enjoined.

## COUNT I
### (Violation of Free Speech Rights Under the First and Fourteenth Amendments to the Constitution of the United States and 42 U.S.C. § 1983)
*(Deon and Magerko v. All Defendants)*

88.     Plaintiffs incorporate by reference all the foregoing and following allegations.

89.     Section 1513's ban on political contributions violates the First Amendment both facially and as applied to Mr. Deon and Ms. Magerko.

90.     Section 1513's ban on political contributions to candidates is neither narrowly tailored to serve a compelling government interest, nor closely drawn to serve a sufficiently important government interest.

91.     Section 1513's ban on contributions to independent-expenditure groups is likewise not narrowly tailored to serve a compelling government interest. Nor is it closely drawn to serve a sufficiently important government interest.

92.     Section 1513's ban on political contributions is overbroad because it prohibits contributions to candidates, campaigns, parties, and other political committees where there is no plausible connection to licensed gaming, and where such contribution fails to raise even the specter of gaming-related corruption.

93.     Section 1513's ban on political contributions from certain classes of individuals associated with licensed gaming has unlawfully deprived the plaintiffs of their respective right to free speech and has unlawfully excluded the plaintiffs from engaging in essential aspects of political participation and discourse.

94.     Section 1513 should be reviewed under the highest scrutiny, though it violates the First Amendment no matter what standard is applied.

95.    As a proximate result of § 1513's absolute and discriminatory prohibition on political contributions from certain classes of individuals associated with licensed gaming, the plaintiffs have been unlawfully deprived of their right to free speech and have been unconstitutionally excluded from participating in an important aspect of the political process.

## COUNT II
### (Violation of Equal Protection Rights Under the Fourteenth Amendment to the Constitution of the United States and 42 U.S.C. § 1983)
### *(Deon and Magerko v. All Defendants)*

100.    Plaintiffs incorporate by reference all the foregoing and following allegations.

101.    Section 1513 violates the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States.

102.    Section 1513 unjustifiably discriminates against a broad class of persons associated with licensed gaming.

103.    Section 1513 unjustifiably discriminates against licensees and applicants for licenses under the Gaming Act by barring their political contributions to Commonwealth candidates and political groups.

104.    Section 1513's ban on political contributions is additionally overbroad because it prohibits contributions even where they lack any plausible connection to licensed gaming.

105.    Pennsylvania failed to narrowly tailor § 1513's absolute ban to achieve a compelling—or even a legitimate—government objective.

106.   Section 1513 should be reviewed under the highest scrutiny, though it violates the Equal Protection Clause under any standard of scrutiny.

107.   As a proximate result of § 1513's absolute and discriminatory prohibition on political contributions from certain classes of individuals associated with licensed gaming, the plaintiffs have been unlawfully deprived of their right to free speech and have been unconstitutionally excluded from participating in an important aspect of the political process.

## PRAYER FOR RELIEF

The plaintiffs request the following relief:

(1)   An order declaring § 1513 of the Pennsylvania Gaming Act unconstitutional, both facially and as applied to the plaintiffs, for violating the plaintiffs' free speech rights under the First and Fourteenth Amendments to the Constitution of the United States;

(2)   An order declaring § 1513 of the Pennsylvania Gaming Act unconstitutional, both facially and as applied to the plaintiffs, for violating the plaintiffs' equal protection rights under the Fourteenth Amendment to the Constitution of the United States;

(3)   An order permanently enjoining the defendants from enforcing § 1513 of the Pennsylvania Gaming Act;

(4)   An order for costs incurred in bringing this action;

(5)   An order for reasonable attorneys' fees under 42 U.S.C. § 1988(b); and

(6)   Such other relief as the Court deems appropriate.

Dated:  October 20, 2017       By: */s/  Amanda L. Morgan*
                                                  AMANDA L. MORGAN (CA 246277)
    JESSE MEDLONG (CA 294536)
    DLA PIPER LLP (US)
    555 Mission Street, Suite 2400
    San Francisco, CA  94105
    Tel:  (312) 836-2500 / Fax: (312) 836-2501
    amanda.morgan@dlapiper.com
    jesse.medlong@dlapiper.com

    JOHN J. HAMILL (IL 6217530)
    DLA PIPER LLP (US)
    444 West Lake Street, Suite 900
    Chicago, IL  60606-0089
    Tel:  (312) 368-4000 / Fax: (312) 236-7516
    john.hamill@dlapiper.com

    NATHAN HELLER (PA 206338)
    TIMOTHY LOWRY (PA 89532)
    COURTNEY SALESKI (PA 90207)
    ADAM DESIPIO (PA 69511)
    DLA PIPER LLP (US)
    One Liberty Place
    1650 Market Street, Suite 4900
    Philadelphia, PA  19103-7300
    Tel:  (215) 656-3300 / Fax: (215) 656-3301
    nathan.heller@dlapiper.com
    timothy.lowry@dlapiper.com
    courtney.saleski@dlapiper.com
    adam.desipio@dlapiper.com

    Attorneys for Plaintiff
    PASQUALE T. DEON, SR.

Dated:  October 20, 2017          By: _/s/ Alexander Saksen_
                                  ALEXANDER SAKSEN (PA 86049)
                                  S. MANOJ JEGASOTHY (PA 80084)
                                  GAVIN EASTGATE (PA 86061)
                                  LEE K. GOLDFARB (PA 309587)
                                  Gordon & Rees LLP (US)
                                  707 Grant Street
                                  Suite 3800
                                  Pittsburgh, PA 15219
                                  Tel:(412)577-7400/ Fax:(412)347-5461
                                  Mjegasothy@grsm.com
                                  Asaksen@grsm.com
                                  Geastgate@grsm.com
                                  Lgoldfarb@grsm.com

                                  Attorneys for Plaintiff
                                  MAGGIE HARDY MAGERKO