IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PASQUALE T. DEON, SR., and MAGGIE HARDY MAGERKO, | : | Civil No. 1:17-cv-1454 |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| DAVID M. BARASCH, KEVIN F. O'TOOLE, RICHARD G. JEWELL, SEAN LOGAN, KATHY M. MANDERINO, MERRITT C. REITZEL, WILLIAM H. RYAN, JR., and DANTE SANTONI JR., Members of the Pennsylvania Gaming Control Board, in their official capacities; PAUL MAURO, Director of the Pennsylvania Gaming Control Board's Bureau of Investigation and Enforcement, in his official capacity; CYRUS PITRE, Director of the Pennsylvania Gaming Control Board's Office of Enforcement Counsel, in his official capacity; and JOSH SHAPIRO, Attorney General of Pennsylvania, in his official capacity, | : | |
| | : | |
| Defendants. | : | Judge Sylvia H. Rambo |

# M E M O R A N D U M

In this civil rights action, Pasquale T. Deon, Sr., and Maggie Magerko ("Plaintiffs") challenge the constitutionality of Section 1513 of the Pennsylvania Gaming Act, 4 Pa. C.S. § 1513, under the First Amendment and the Equal Protection Clause of the Fourteenth Amendment. Presently before the court is Plaintiff's motion for summary judgment seeking declaratory and injunctive relief. For the reasons that follow, the court will grant Plaintiff's motion.

# I.    Factual Background and Procedural History

The facts relevant to the disposition of this matter are not in dispute. Plaintiff Deon is a shareholder of Sands Pennsylvania Inc., a company owning a 90 percent interest in Sands Bethworks Gaming LLC ("Sands"), a privately held gaming business licensee under the Gaming Act. (Doc. 47, ¶¶ 1, 2.)  Plaintiff Magerko is the beneficiary of a trust that is the owner of Nemacolin Woodlands, Inc. ("Nemacolin").  (*Id.* at ¶ 10.)  Nemacolin owns Woodlands Fayette, LLC ("Woodlands"), a privately held gaming business licensee under the Gaming Act. (*Id.* at ¶¶ 10, 11.)  Both plaintiffs applied to the Pennsylvania Gaming Control Board ("Board") to be licensed as a "principal"[1] under the Gaming Act.  (*Id.* at ¶¶ 5, 17.)  Defendants are members or employees of the Board and the Attorney General of Pennsylvania and are tasked with the enforcement of the Gaming Act and rules and regulations promulgated thereunder.  (*Id.* at ¶ 23.)

Plaintiff Deon filed the initial complaint in this matter on August 15, 2017. (Doc. 1.)  Defendants filed an answer with affirmative defenses on September 29, 2017.  (Doc. 32.)  On October 20, 2017, Plaintiffs filed an amended complaint, and

---

[1] The term "principal" is defined as "[a]n officer; director; person who directly holds a beneficial interest in or ownership of the securities of an applicant or licensee; person who has a controlling interest in an applicant or licensee, or has the ability to elect a majority of the board of directors of a licensee or to otherwise control a licensee. . ."  Prior to 2006, this classification was defined as a "key employee qualifier."  *See* 2006 Pa. Legis. Serv. Act 2006-135 (S.B. 862) (Nov. 1, 2006); 37 Pa. Bull. 2808 (June 23, 2007) ("The term 'key employee qualifier' has also been deleted; it was replaced with the term 'principal'").  Plaintiffs originally applied for licenses when the "key employee qualifier" terminology was used.  The distinction is immaterial to this court's decision.  Thus, for clarity the court will refer to Plaintiffs as "principals" herein.

Defendants again filed an answer with affirmative defenses on November 3, 2017. (Docs. 34, 38.) Plaintiffs filed the instant motion for summary judgment on January 16, 2018. (Doc. 46.) The matter has been fully briefed and is ripe for disposition.

## II.  Discussion

Plaintiffs argue that Section 1513 of the Gaming Act is unconstitutional under the First Amendment and the Equal Protection Clause of the Fourteenth Amendment because it prohibits certain classes of people, *e.g.* gaming-license applicants, licensees, and principals of licensees, from making any political contributions. In pertinent part, Section 1513 provides:

> The following persons shall be prohibited from contributing any money or in-kind contribution to a candidate for nomination or election to any public office in this Commonwealth, or to any political party committee or other political committee in this Commonwealth or to any group, committee or association organized in support of a candidate, political party committee or other political committee in this Commonwealth:
>
> (1) An applicant for a slot machine license, manufacturer license, supplier license, principal license, key employee license, interactive gaming license or horse or harness racing license.
>
> (2) A slot machine licensee, licensed manufacturer, licensed supplier, interactive gaming operator or licensed racing entity.
>
> (3) A licensed principal or licensed key employee of a slot machine licensee, licensed manufacturer, licensed supplier, interactive gaming operator or licensed racing entity.

4 Pa. C.S. § 1513. A "political committee" is defined as "[a]ny committee, club, association or other group of persons which receives contributions or makes expenditures." 4 Pa. C.S. § 1513(d). Section 1513(c) establishes penalties for unlawful contributions including civil fines and misdemeanors. Plaintiffs aver that they desire to make political contributions, but have been unable to do so for fear of incurring fines or risking criminal prosecution under the Gaming Act.

### A. Legal Standards

Summary judgment is appropriate where "there is no genuine issue as to any material fact and [] the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). A genuine issue of material fact exists only when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate where only issues of law remain. *Int'l Bhd. of Elec. Workers, AFL-CIO, Local 1522 v. AT & T Microelectronics, Inc.*, 909 F. Supp. 294, 296 (E.D. Pa. 1995); *Kreimer v. Bureau of Police for Town of Morristown*, 958 F.2d 1242, 1250 (3d Cir. 1992). Because the parties agree on the relevant facts and raise only issues of law, this matter is ripe for summary adjudication.

The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws "abridging the freedom of speech." U.S. Const., Amdt. 1. As a general principle, the First Amendment prohibits the government from restricting expression "because of its message, its ideas, its subject matter, or its content." *Ashcroft v. Am. Civil Liberties Union*, 535 U.S. 564, 573 (2002). Thus, any law or regulation that is content based will be subjected to a strict scrutiny analysis, meaning that the law must be the least restrictive means to achieve a compelling governmental interest. *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2226 (2015) (internal quotation omitted). Conversely, where a law is content neutral, the courts apply an intermediate scrutiny analysis that requires the government to prove only that the law is "narrowly tailored to achieve a significant government interest." *McTernan v. City of York, PA*, 564 F.3d 636, 653 (3d Cir. 2009).

In the context of elections for government office, the Supreme Court has opined that "[t]here is no right more basic in our democracy than the right to participate in electing our political leaders." *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 191 (2014) (Roberts, C.J.) (plurality opinion). To that end, the Court in *McCutcheon* established a modified standard of scrutiny uniquely applicable to limits on direct campaign contributions in contrast to restrictions on independent expenditures, *i.e.*, expenditures made independently of a candidate's

campaign such as to a Political Action Committee ("PAC"). Restrictions on independent expenditures remain subject to strict scrutiny; however, restrictions on direct campaign contributions are subject to a modified form of intermediate scrutiny, described as a "lesser but 'still rigorous standard of review.'" *Id.* (citing *Buckley v. Valeo*, 424 U.S. 1, 29 (1976)). "Under that standard, '[e]ven a "significant interference" with protected rights of political association may be sustained if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgement of associational freedoms.'" *Id.* (quoting *Buckley v. Valeo*, 424 U.S. at 25). Thus, the first step in the court's inquiry is to determine if the Commonwealth has demonstrated a sufficiently important interest justifying the contribution ban.

### B. Sufficiently Important Governmental Interest

The Commonwealth bears the burden of proving the constitutionality of Section 1513. *McCutcheon*, 572 U.S. at 209 (citing *U.S. v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816 (2000)). "[M]ere conjecture" about the risk of corruption or its appearance is insufficient to show that a contribution restriction promotes a sufficiently important government interest. *Id.* at 210; *Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 392 (2000). The Supreme Court has expressly recognized that preventing *quid pro quo* corruption or the appearance of such corruption is a sufficiently important reason, and in fact, the only sufficiently

important reason, to justify restrictions on political contributions. *McCutcheon*, 572 U.S. at 207-208 (citing *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 359 (2010)). In the instant case, it is uncontested that the ostensible purpose of Section 1513 is to prevent *quid pro quo* corruption and the appearance of such corruption. The legislative purpose section of the Gaming Act was recently amended to specifically provide:

> The General Assembly has a compelling interest in protecting the integrity of both the electoral process and the legislative process by preventing corruption and the appearance of corruption which may arise through permitting any type of political campaign contributions by certain persons involved in the gaming industry and regulated under this part.

> Banning all types of political campaign contributions by certain persons subject to this part is necessary to prevent corruption and the appearance of corruption that may arise when political campaign contributions and gaming regulated under this part are intermingled.

4 Pa. C.S. § 1102 (10.1); (10.2).

The stated purpose of the law is legitimate and commendable to the extent it seeks to prohibit corruption or the appearance of corruption, yet a laudable purpose is not dispositive as to the law's constitutionality. The Commonwealth's brief is largely dedicated to addressing two questions that are not in dispute: (1) that preventing corruption is a legitimate governmental interest; and (2) that a wholesale ban on political contributions would tend to inhibit political corruption. (Doc. 54, pp. 8-15.) The first was well-settled by *McCutcheon* and the second is

beyond reasonable debate. The Commonwealth, however, had made no showing of a heightened need to preclude all political contributions beyond the purpose recognized in *McCutcheon*. The Commonwealth's justification appears to rely entirely on historical assumptions that gaming is an industry rife with potential for corruption. The legislative histories Defendants cite refer to neither actual instances of corruption in Pennsylvania, nor any studies done to determine if pervasive corruption exists, or discuss that a limitation only on large contributions was insufficient. Without any real evidence that the complained-of harm exists within the Commonwealth, the legislative purpose amounts to no more than the "mere conjecture" that the Supreme Court took issue with in *McCutcheon*.

"But in general, courts have deferred to legislative determinations that contribution restrictions are a necessary prophylactic measure in combatting potential corruption. In addition, the Supreme Court has instructed that the quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised." *Ball v. Madigan*, 245 F. Supp. 3d 1004, 1013 (N.D. Ill. 2017), *appeal dismissed*, No. 17-cv-1896, 2017 WL 5054202 (7th Cir. May 30, 2017) (citing *Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. at 391 n.5 (collecting cases)) (internal quotations omitted). In *Nixon*, the Supreme Court stated that "[t]he dangers of *large, corrupt* contributions and the *suspicion that large*

*contributions are corrupt* are neither novel nor implausible." *Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. at 391. It is generally accepted that the gaming industry has historically been more prone to corruption that other state-regulated industries. Thus, it is likely not "novel" or "implausible" that large contributions from a gaming licensee or owner of a licensee would raise suspicions of corruption. *Ball v. Madigan*, 245 F. Supp. 3d at 1015 (collecting cases describing historical risk of corruption in gaming industry and comparing risk of corruption in gaming to risk of corruption in newly formed Illinois medical marijuana industry). The ban becomes somewhat more novel, however, when it includes *de minimis* contributions from those tangentially related to the industry.

While Plaintiff Deon is significantly involved in the management of a gaming licensee, there is no contention that Plaintiff Magerko has any direct involvement with the industry. She is the beneficiary of a trust that owns a stake in a single licensee, yet the law makes no distinction between the two when it comes to banning political contributions. Thus, under *Nixon*, there may be cause for some increased scrutiny of the legislature's determination. The Commonwealth and Campaign *Amici* point to several cases where courts have held wholesale bans in other industries appropriate. These cases are distinguishable, however, because they do not deal with licensees, but those who do business directly with the government and those whose business it is to influence government officials. *See*

*Wagner v. Fed. Election Comm'n*, 793 F.3d 1, 22 (D.C. Cir. 2015) ("Indeed, if there is an area that can be described as the "heartland" of [*quid pro quo* corruption] concerns, the contracting process is it."); *Ognibene v. Parkes*, 671 F.3d 174 (2nd Cir. 2011) (upholding contribution ban with New York City contractors); *Preston v. Leake*, 660 F.3d 726 (4th Cir. 2011) (upholding ban on lobbyist contributions). Thus, the court concludes that the Commonwealth has the same general interest in preventing *quid pro quo* corruption or its appearance in state and local elections as articulated in *McCutcheon*, but that the Commonwealth has failed to show a heightened justification for political contribution restrictions analogous to the government contracting and lobbying industries. The court will now address whether a wholesale ban on campaign contributions from those related to the gaming industry is closely drawn to achieve this purpose.

### C. Closely Drawn to Achieve a Sufficiently Important Interest

The court will next discuss the second prong of the modified intermediate scrutiny analysis: whether the law is "closely drawn" to achieve the government's legitimate interest. Several cases cited by the parties discuss when a political contribution ban is closely drawn. Therefore, the court will review and distinguish these cases to aid its analysis.

*1. Depaul*

Likely the most pertinent case and certainly the most factually similar, the Supreme Court of Pennsylvania had previously declared Section 1513 unconstitutional under the Pennsylvania Constitution in *DePaul v. Commonwealth of Pennsylvania*, 969 A.2d 536, 537 (Pa. 2009). In *DePaul*, the petitioner filed a complaint seeking declaratory and injunctive relief, arguing that the ban was unconstitutional because it was an overly broad and unlawfully discriminatory infringement of the rights to free expression and association guaranteed by Article I, Sections 7, 20, and 26 of the Pennsylvania Constitution. Relevantly, Article I, Section 7 of the Pennsylvania Constitution provides: "The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty." *See Pap's A.M. v. City of Erie*, 812 A.2d 591, 605 (Pa. 2002) (Article I, Section 7 provides broader protection for freedom of expression than First Amendment of federal constitution); *Commonwealth. v. Tate*, 432 A.2d 1382, 1387 (Pa. 1981) (state constitutional rights may be more expansive than federal counterparts). Similar to Plaintiffs, the petitioner in *DePaul* held an ownership interest in an investment firm that owned a majority share of a gaming facility development partnership, which in turn, owned the planned "Foxwoods Casino." *Id.* at 538.

The Pennsylvania Supreme Court undertook a survey of other states that allowed gaming to determine whether those states restricted political contributions from individuals affiliated with the gaming industry and, if so, to what extent. As of 2009, the Court identified twenty states that authorized commercial casinos or horse-race betting: Colorado, Delaware, Florida, Illinois, Indiana, Iowa, Louisiana, Maine, Michigan, Mississippi, Missouri, Nevada, New Jersey, New Mexico, New York, Oklahoma, Rhode Island, South Dakota, West Virginia, and, of course, Pennsylvania.[2] The Court noted that "[t]he vast majority of these nineteen states— fourteen: Colorado, Delaware, Florida, Illinois, Maine, Mississippi, Missouri, Nevada, New Mexico, New York, Oklahoma, Rhode Island, South Dakota and West Virginia—do not regulate political contributions by individuals involved in the gaming industry." *DePaul v. Com.*, 969 A.2d at 548. In reviewing these laws, the Court identified five states that have total bans on political contributions comparable to Section 1513. *Id.* at 549. The Court, however, opined that four of

---

[2] Between the time *DePaul* appealed to the Pennsylvania Supreme Court and the present date, Kansas, Maryland, Massachusetts, and Ohio have legalized some form of gaming. It does not appear that Kansas limits political contributions from gaming licensees. Ohio prohibits public officials with a "gaming regulatory function" from investing in or controlling a casino, casino holding company, or gaming-related vendor. R.O.C. § 102.03(L). Massachusetts prohibits campaign contributions from a "gaming license[e], [] any holding, intermediary or subsidiary company thereof, [] any officer, director, key gaming employee or principal employee of an applicant for a gaming license." Mass. Gen. Laws Ann. ch. 23K, § 46. Massachusetts also has several regulatory disclosure requirements for other political contributions. 205 CMR 108.00. Maryland has a very limited campaign finance ban which applies only to video lottery licensees and nonfederal public campaign donations. Md. Code Ann., Elec. Law § 13-237. Neither the *DePaul* Court's nor this expanded list include tribal casinos in other states.

those states, Michigan, New Jersey, Indiana, and Iowa, had bans that were more limited in the scope of who is prohibited from contributing, *e.g.* Iowa only prohibits riverboat gambling licensees from contributing, Iowa Code § 99F.6,[3] and New Jersey restricts "applicants and holders of casino licenses and any holding, intermediary or subsidiary company of a licensee or applicant, as well as officers or directors and key or principal employees." N.J. Stat. Ann. § 5:12–138. Only Louisiana's contribution ban equaled or exceeded the scope of Section 1513. La. Rev. Stat. Ann. § 18:1505.2 (2002).[4] The Court noted that although New Jersey and Louisiana's bans had survived judicial scrutiny, the others had never been tested in court.

The Pennsylvania Supreme Court concluded that, although the stated purpose of preventing corruption or the appearance of corruption was a legitimate governmental interest, the wholesale contribution ban was not narrowly tailored to achieve that goal. The Court reasoned that: "Banning all contributions is not a narrowly drawn means of furthering a policy of negating the corrupting effect and appearance of large contributions. It totally bans a protected form of political expression and association

---

[3] The Iowa Code related to gaming was amended in 2015. Relevantly, under current Iowa law, only a "qualified sponsoring organization" ("QSO") is prohibited from making political contributions. A QSO is defined as "a non-profit entity that is licensed by the state to operate the gambling games itself or [] contract with another person or entity to operate the games." *Cmty. Action Agency of Siouxland v. Belle of Sioux City, L.P.*, No. 16-cv-4141, 2017 WL 1398340, *2 (N.D. Iowa Apr. 18, 2017).

[4] The Louisiana ban was amended in 2002 to expressly exempt contributions that were not made directly or indirectly to finance a candidate's campaign. 2004 La. Sess. Law Serv. Act 760 (H.B. 510).

which is unrelated to the identified interest, and does so despite the availability of more narrowly tailored restrictions." *DePaul*, 969 A.2d at 553. Accordingly, the Court held the law unconstitutional and enjoined its enforcement.

In the wake of the *DePaul* decision, the Pennsylvania legislature amended the legislative purpose of the Gaming Act with the express purpose of remedying the constitutional deficiency discussed by the Pennsylvania Supreme Court. (Doc. 54-3, p. 13.) The Commonwealth now argues that the legislative purpose amendment providing that political contributions in any amount rather than just large contributions are likely to result in *quid pro quo* corruption cures the constitutional defect of a wholesale ban on political contributions. In reaching its decision, the *DePaul* Court cited the reasoning of a New Jersey intermediate appellate court and the Supreme Court of Louisiana that each found similar political contribution bans constitutional under their respective state constitutions. As both cases are again relied upon by the Commonwealth, the court will address them herein.

### 2. *Soto and Casino Association*

In *Petition of Soto*, 565 A.2d 1088 (App. Div. 1989), the New Jersey Superior Court upheld a New Jersey statute prohibiting "casino key employees," defined as "persons in a supervisory capacity or empowered to make discretionary decisions which regulate casino operations," under Article 1, Paragraph 1 of the New Jersey constitution. *Soto*, 565 A.2d at 1110 (citing 325 N.J. S.A. 5:12–9 (1984)). The Casino Control Commission of New Jersey had designated Ms. Soto as a key employee because she held several key positions in the gaming industry and, consequently, determined that she was

statutorily prohibited both from making political contributions or donating free legal services to a political party. *Id.* at 1092-93. Ms. Soto subsequently appealed the Commission's decision. *Id.* at 1093. Specifically, the statute prohibited contributions to "any candidate for nomination or election to any public office in this State, or to any committee of any political party in this State, or to any group, committee or association organized in support of any such candidate or political party." N.J. S.A. § 5:12-138. Relevantly, Ms. Soto wanted to provide free legal services to the New Jersey Hispanic Democrats, which were considered to be "things of value" under the New Jersey contribution ban. *Soto*, 565 A.2d at 1093.

Citing *Buckley*, the New Jersey court initially held that preventing corruption and its appearance is a significant governmental interest. The *Soto* court then reasoned that a comprehensive ban was a valid limit on free speech. In doing so, it referred to the context in which the New Jersey law was enacted. The New Jersey constitution expressly forbade gambling in the state until 1976. N.J. Const., Art. IV, § VII; *see also Knight v. Margate*, 431 A.2d 833 (1981) ("Gambling is an activity rife with evil, so prepotent its mischief in terms of the public welfare and morality that it is governed directly by the [New Jersey] Constitution itself.) After the constitution was amended and the ban removed, the proliferation of gambling within the state led to an appreciable increase in gaming-related political contributions:

> The need for the type of restriction embodied in § 138 was identified by the State Commission of Investigation (SCI) in its April 1977 report to the Governor and Legislature, entitled Report and Recommendations on Casino Gambling. The report noted that, "contributions by casino licensees, both corporate and individual, give the appearance of attempting to "buy"

political influence and favoritism and in fact have the very real potential for causing such favoritism to occur. . . . The State Commission of Investigation is inclined to recommend[ ] an absolute prohibition against any licensee of the state regulatory authority, whether it be an individual, corporation or so-called "holding company[,]" from making a contribution to any political candidate, party or campaign organization within this State, either directly or indirectly.

*Soto*, 5065 A.2d at 1096 (quoting the State Commission of Investigation, Report and Recommendations on Casino Gambling 4–I—5–I (1977) (alterations in original)). In light of New Jersey's historical relationship with gambling, the *Soto* court concluded that: "Given the acknowledged vulnerability of the casino industry to organized crime and the compelling interest in maintaining the public trust, not only in the casino industry but also the governmental process which so closely regulates it, there is no viable alternative available to prevent the appearance of, or actual, corruption of the political process in New Jersey." *Id.* (citing *Greenberg v. Kimmelman*, 494 A.2d 294, 306 (1985) ("A public perception that any improper influence has infiltrated the [regulatory and judicial] processes, however slightly, would undermine the trust that is essential to continued confidence in the industry and, what is more important, in state government.")). On this basis, the New Jersey Superior Court concluded that the complete ban on contributions was closely drawn to achieve New Jersey's specific interests.

In *Casino Association of Louisiana v. State ex rel. Foster*, 820 So.2d 494 (La. 2002), the Casino Association of Louisiana ("CAL") challenged the constitutionality of La. R.S. 18:1505.2(L), which prohibited campaign

contributions by certain members of the riverboat and land-based casino industries. In pertinent part, La. R.S. 18:1505.2(L) provided that: "No person to whom this Subsection is applicable . . . shall make a contribution, loan, or transfer of funds, including but not limited to any in-kind contribution, . . . to any candidate, any political committee of any such candidate, or to any other political committee which supports or opposes any candidate." That section applied to licensees, operators, manufacturers, any individual holding an interest in a gaming licensee or any holding company that has such an interest, officers, directors, trustees, and key employees of licensees. The prohibition also extended to spouses of such individuals. La. R.S. 18:1505.2(L)(3)(b)(c)(e).

The Louisiana Supreme Court held that the ban was closely drawn under the First Amendment because, although it was expansive with respect to the individuals that it covered, it did not extend to independent expenditures. In doing so, the Court declined to follow its prior holding in *Penn v. State ex rel. Foster*, 751 So. 2d 823 (La. 1999). The *Penn* Court held a prior version of La. R.S. 18:1505.2(L)(3) unconstitutional to the extent that it precluded "candidate and political committee contributions by video draw poker licensees." *Casino Ass'n*, 820 So.2d at 497. The Louisiana Supreme Court relied on decisions from several other jurisdictions, including *Soto*, that had banned campaign contributions in some form. *See State v. Alaska Civil Liberties Union*, 978 P.2d 597 (Alaska 1999),

*cert. denied*, 528 U.S. 1153 (2000) (upholding complete ban on campaign contributions by out-of-district lobbyists); *Schiller Park Colonial Inn, Inc. v. Berz,* 349 N.E.2d 61 (1976) (upholding complete ban on campaign contributions by liquor licensees or their representatives); *North Carolina Right to Life, Inc. v. Bartlett*, 168 F.3d 705 (4th Cir. 1999), *cert. denied*, 528 U.S. 1153 (2000) (upholding complete bans on campaign contributions by lobbyists). Notably, the Court referenced 2 U.S.C. § 441b(a), which prohibited corporate contributions to candidates and candidate committees and was held unconstitutional in *Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010).

Like the New Jersey Superior Court in *Soto*, the Louisiana Court examined the state's tumultuous history with gambling[5] and reviewed the legislative committee meeting notes from the enactment of La. R.S. 18:1505.2(L):

---

[5] The *Casino Association* Court quoted the dissent from the *Penn* Court's majority:

> The Louisiana Constitution of 1879 declared gambling a "vice" and the Legislature was directed to enact laws for its suppression. LA. CONST. art. 172 (1879). Louisiana's Constitutions of 1898, 1913, and 1921 all contained similar provisions regarding gambling. *See* LA. CONST. art. 19, Sec. 8 (1921); LA. CONST. arts. 178, 188, 189 (1913); LA. CONST. arts. 178, 188, 189 (1898). Although the delegates to the Constitutional Convention which convened on January 5, 1973, eliminated the moral condemnation of gambling and chose to suppress gambling rather than prohibit it, it is clear that the Legislature continued its role of defining gambling.

*Penn*, 751 So. 2d at 849 (Knoll, J., dissenting), *quoted in Casino Ass'n of Louisiana*, 820 So. 2d at 504.

> With the boom of the petrochemical industry during the 1970s and 1980s, the State's economy was revitalized. There was no longer a need for gambling proceeds to fund government projects, that is until the bottom fell out of the oil industry. However, when the State's economy went into a tailspin with the

I think that this industry stands onto itself and ought to stand onto itself as one that we ought to be singling out for the purpose of trying to limit their involvement in the legislative process and unfortunately I think it is appropriate to look to what has happened over the course of the past couple of years specifically on how individuals within the industry have been accused of attempting to influence the legislative process based upon the industry's entry into the state . . . it is directed to specifically [sic] at the gambling industry and to say we believe in Louisiana; we ought to limit the gambling industry's influence in the political process.

. . . .

I will say this about this particular bill. I don't know of any other industry that was singled out in the past campaign as something for the public to look at when you had gubernatorial candidates, you had legislative candidates saying I'm not going to take money from the gambling industry or making a campaign issue over where contributions came from. This is a major, major source of concern in the minds of the public from my viewpoint as to what influence the gambling industry has had over this legislature and this government during its infancy in Louisiana and I think it is an appropriate bill to advance in the legislature to say that we are going to say it is not appropriate for the gambling industry to be making political contributions.

*See* Committee on Senate and Governmental Affairs, Verbatim Transcript Meeting of March 26, 1996, Senate Bill 12, *quoted in Casino Ass'n of Louisiana*, 820 So. 2d at 506-507. Based on this historical overview, the Court concluded that (1) the

---

decline in the oil industry, the State Legislature, armed with its constitutional authority to "define gambling," turned to legalized gambling as a means out of the fiscal doldrums. In a series of enactments in 1991 and 1992, the Legislature passed four acts providing for the licensing of gaming, to-wit: at a land-based casino in New Orleans, La. R.S. 4:601–686; on cruise ships operating out of New Orleans, La. R.S. 14:90(B); on river boats operating on designated rivers in the state, La. R.S. 4:501–562; and by means of video poker machines located throughout the State, La. R.S. 33:4862.1–19.

*Casino Ass'n of Louisiana*, 820 So. 2d at 505 (internal citations omitted).

law's purpose was to prevent corruption and its appearance; (2) that purpose was a sufficiently important interest; and (3) the complete ban on contributions furthered that purpose. *Id.* at 508 (citing *Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377 at 390 ("*Buckley* demonstrates that the dangers of large, corrupt contributions and the suspicion that large contributions are corrupt are neither novel nor implausible")). The Court went on to review Louisiana laws imposing general campaign finance limitations and disclosure requirements, anti-bribery statutes, other gaming laws requiring background checks to guarantee that "anyone who obtains a gaming interest is 'suitable' and honest." *Id.* After noting the other anti-corruption statutes, the Louisiana Supreme Court found that the mere presence of alternative statues that would effect the same goal did not preclude a contribution ban from being closely drawn. *Id.* ("The United States Supreme Court has also repeatedly rejected the gaming interests' argument that the statute is not 'closely drawn' to support a sufficiently important government interest because there are less restrictive measures on the books"). Thus, the Court held that the complete campaign contribution ban was constitutional.

3. *Ball*

The most recent federal court decision on industry-specific campaign finance prohibitions is *Ball v. Madigan*, 245 F. Supp. 3d 1004 (N.D. Ill. 2017), *appeal dismissed*, No. 17-cv-1896, 2017 WL 5054202 (7th Cir. May 30, 2017). In

2013, the Illinois legislature enacted a statute banning medical cannabis cultivation centers and dispensaries and certain affiliated individuals from "making campaign contributions to any political committee established to promote a candidate for public office. The statute likewise bans candidates and political committees from receiving such contributions. 10 Ill. C.S. 5/9–45." *Id.* at 1008.[6] The *Ball* court first assessed whether Illinois had a sufficiently important interest in preventing *quid pro quo* corruption in the medical cannabis industry. The court noted that the government has produced little in the way of evidence of corruption aside from statements made by state legislators at hearings on 10 Ill. C.S. 5/9–45. The government also noted the recent legalization of cannabis within the state and Illinois' past history with general political corruption. *Id.* at 1012. The court lamented the paucity of evidence presented by the government, but, relying on *Nixon*, 528 U.S. 377, concluded that the risk of "large, corrupt contributions and the suspicion that large contributions are corrupt are neither novel nor implausible." Thus, its inquiry required only a minimal "quantum of empirical

---

[6] *Amici* Campaign Legal Center and Common Cause ("Campaign *Amici*") seem to suggest that this would be a more apt prohibition, and the Pennsylvania legislature actually considered and rejected a similar amendment. (Doc. 54-2, pp. 57-58.) In their brief in opposition to Plaintiffs' motion for summary judgment, Campaign *Amici* argue that candidates are apparently strong-arming those in the gaming industry into contributing to their campaigns and that the ban actually protects those in the gaming industry by giving them a statutory excuse to refuse to contribute. (Doc. 55, p. 30-31.) Curiously, Campaign *Amici* do not suggest that the law should in any way punish these hypothetical candidates who threaten those in the gaming industry; yet those who succumb to coercion should be subject to criminal penalties.

evidence" to demonstrate the existence of a sufficiently important interest in prohibiting corruption in the medical cannabis industry. *Id.* at 1013.

The *Ball* court next analyzed whether an outright ban on campaign contributions is closely drawn to avoid unnecessary abridgment of associational freedoms. *Id.* at 1013 (citations omitted). The court noted that "[s]everal features of § 9–45 render it plainly disproportional to the government's interest in preventing *quid pro quo* corruption or its appearance. First, § 9–45 is a disproportionate measure in that it imposes an outright ban on contributions, rather than a mere dollar limit on contribution amounts." *Id* at 1014. Comparing the Illinois ban to other campaign finance limitations, the court explained that limits were favored over outright bans barring a showing of a greater and specific need for wholesale prohibitions. The court cautioned against the "heavy handed prophylaxis-upon-prophylaxis approach," where Illinois had general campaign finance contribution limitations that had not been shown ineffective in preventing the risk of corruption specific to the medical cannabis industry. *Id.* (citing *McCutcheon*, 572 U.S. at 221) (internal quotation omitted). The *Ball* court reasoned that Illinois had demonstrated no specific need for heightened regulation of the medical cannabis industry beyond "other potential donors who also reap profits and require State licensure to operate," comparing accepted "high-risk" industries such as government contractors, lobbyists, and other industries doing

business directly with the government as opposed to operating pursuant to state-issued licenses. *Id.* (citing *Wagner v. Fed. Election Comm'n*, 793 F.3d 1, 21 (D.C. Cir. 2015) (upholding state ban on contributions from lobbyists, in part because lobbyists "are especially susceptible to political corruption")).

The court expressly distinguished *Soto* and *Casino Association*, because the government in both cases had supported the gaming-specific ban with evidence of corruption unique to the gaming industry. *Id.* at 1016. "By contrast, [Illinois] offered no evidence of actual corruption, in Illinois or elsewhere, involving the medical cannabis industry;" instead, the Illinois government relied only on "five news reports as evidence of an appearance of corruption." *Id.* Without more, the court found that these reports "provide no reason to suspect that the appearance of corruption is a problem unique to the medical cannabis industry, rather than a problem afflicting highly regulated industries in general, so as to justify the targeted approach." *Id.* The *Ball* court distinguished the Illinois Supreme Court's decision in *Schiller Park Colonial Inn, Inc. v. Berz*, 349 N.E. 2d 61 (Ill. 1976), holding that a contribution ban applied only to liquor licenses was constitutional, explaining that the *Schiller Park* Court was "at odds with the United States Supreme Court's more recent holdings that a contribution restriction may withstand a First Amendment challenge only if it promotes the government's interest in preventing *quid pro quo* corruption or its appearance." *Id.* (citing

*McCutcheon*, 572 U.S. at 206; *Citizens United*, 558 U.S. at 359). Both *Soto* and *Casino Association* relied substantially on *Schiller Park* in finding the respective state contribution bans constitutional. In sum, the court concluded that the Illinois government had failed to demonstrate that the ban was closely drawn because it failed to justify the significant infringement on the free speech rights of individuals in the medical cannabis industry or demonstrate that less-restrictive general campaign finance limitations were insufficient to prevent corruption in that industry. Accordingly, the court declared 10 Ill. C.S. 5/9–45 unconstitutional and enjoined enforcement of the ban.

    *4. Whether Section 1513 is closely drawn to achieve the Commonwealth's substantially important purpose*

    "In determining whether a restriction is closely drawn, courts assess the means–end fit between the restriction and the asserted government interest. The restriction need not be the least restrictive means available of promoting the interest, but it must be reasonably proportional to the interest while avoiding needless infringement of First Amendment rights." *Ball v. Madigan*, 245 F. Supp. 3d at 1013. A law may seek to address *quid pro quo* corruption, but it may not go so far as to prohibit "the appearance of mere influence or access." *McCutcheon*, 572 U.S. at 208. Drawing this distinction, the Supreme Court noted that a small donation could result in the donor receiving some appreciable influence or access

24

to a political candidate, whereas a large donation is more likely to be given specifically in return for political preference or specific favors. Thus, a cap on donations and contributions to a single candidate has been more favorably viewed in First Amendment analyses than a wholesale ban on contributions. *See Lodge No. 5 of Fraternal Order of Police ex rel. McNesby v. City of Phila.*, 763 F.3d 358, 379 (3d Cir. 2014) ("The Supreme Court has expressed skepticism of political speech restrictions based on broad anticorruption rationales in recent campaign finance decisions.") (considering campaign contribution bans for public employees). Here, the court concludes that Section 1513 goes far beyond the legitimate purpose of preventing corruption or the appearance of corruption and even goes beyond the prevention of "mere influence" described in *McCutcheon*. Section 1513 entirely stifles Plaintiffs' "right to participate in electing our political leaders" by making political contributions. *McCutcheon*, 572 U.S. at 191; *Citizens United*, 558 U.S. at 359.

Soto and *Casino Association* are both readily distinguishable. Along with *DePaul*, both were decided prior to the Supreme Court's decision in *McCutcheon*. Initially, both Louisiana and New Jersey had a long and sordid history related to gambling, upon which the strict limitations were founded. The Supreme Court of Louisiana and the intermediate New Jersey appellate court both referred to the history of corruption and illegal activity associated with gambling in the respective

jurisdictions. The court has no evidence of a similar historical background in Pennsylvania.

Although the Commonwealth correctly argues that a state's legislature may look to the experiences and studies of other jurisdictions instead of creating redundant investigations, *see DePaul*, 969 A.2d at 597, the identification of a legitimate state interest does not license the legislature to enact any palliative measure, regardless of its restrictiveness. When the Commonwealth's chosen method of protecting its interest is a sweeping restriction on Constitutional rights, greater justification is necessary. Although it would be naïve to assume that, prior to its legalization in 2004, there was no illegal gambling or other associated criminal activities in the Commonwealth, gaming has been a highly scrutinized and regulated industry in Pennsylvania for nearly fifteen years. There are numerous reporting laws and administrative oversight in the gaming industry that would limit corruption and unlawful activity. There is no evidence that, in Pennsylvania, legalized gaming is uniquely susceptible to corrupt influence beyond other state-licensed industries. This is not to say that a wholesale ban could never be constitutional, but merely that the Commonwealth has not demonstrated that the risk of corruption in gaming is so great that it requires a complete ban or that other, less restrictive measures have been inadequate to achieve this goal. In sum, there is no evidence of a justification for heightened campaign finance restrictions

specific to gaming beyond a restriction appropriate for restraining corruption from any other state-regulated industry.

Moreover, the restrictions in place in Louisiana and New Jersey were less restrictive than the Pennsylvania ban despite a greater justification for a wholesale ban. The Louisiana ban applied broadly to individuals associated with the industry, covering licensees and those who held an interest in licensees, and even extended to the spouses of those individuals. It was more limited, however, in the types of contributions that it prohibited as it did not extend to independent expenditures.[7] The other cases relied upon by the Louisiana Supreme Court were similarly more narrow in their scope. *See Alaska Civil Liberties Union*, 978 P.2d 597 (ban on campaign contributions applied only to out-of-district lobbyists)*; Schiller Park,* 349 N.E. 2d 61 (ban applied only to liquor licensees and their direct representatives);[8] *Bartlett*, 168 F.3d at 715 (upholding complete bans on campaign

---

[7] The Commonwealth argues that Section 1513 does not apply to independent expenditures. (Doc. 54, p. 23.) This is not clear, however, from the text of the statute. Section 1513 prohibits contributions to "any . . . other political committee in this Commonwealth" or to any "group, committee, or association organized in support of a . . . political committee in this Commonwealth." 4 Pa. C.S. 1513(a). Political committee is defined as "Any committee, club, association or other group or person which receives contributions or makes expenditures." 4 Pa. C.S. 1513(d). In the absence of any regulatory or administrative guidance, it is unclear whether this section was intended to encompass independent expenditures or other types of political contributions beyond direct or indirect campaign contributions. A plain reading of the statute, however, would include such contributions. Even if the ban did not extend to independent expenditures, the court would still find that it is not closely drawn to achieve its purpose.

[8] The Illinois ban in *Schiller Park* also was limited in its definition of a licensee. It applied only "where more than 5% Of [sic] the licensee's gross income is derived from the sale of alcoholic liquor." *Schiller Park*, 349 N.E. 2d at 64-65 (quoting Section 12 of the Illinois Liquor Control Act, Ill.Rev.Stat.1973, ch. 43, par. 132).

contributions by lobbyists while the legislature is in session). In each of these cases, the ban did not extend beyond campaign contributions into independent expenditures, and the courts appeared to draw no distinction between corruption and "mere influence." In *Bartlett*, the Fifth Circuit relied on the *Buckley* Court's instruction that "a 'court has no scalpel to probe' such fine distinctions" in the size of political contributions. *Bartlett*, 168 F.3d at 716 (quoting *Buckley v. Valeo*, 424 U.S. at 30 (internal quotation marks omitted)). Subsequent Supreme Court case law, however, has refined the edge of a court's inquiry into the specific limitations imposed by legislatures on political contributions. Although a court may not nitpick a legislature's determination that a certain monetary limit is sufficient to restrain corruption, a court must "'exercise independent judicial judgment as a statute reaches [the] outer limits' of what is constitutionally permissible." *Zimmerman v. City of Austin, Texas*, 881 F.3d 378, 387 (5th Cir. 2018) (quoting *Randall v. Sorrell*, 548 U.S. 230, 249 (2006)). The Supreme Court has held that a contribution limit is unconstitutional if it is "so radical in effect as to render political association ineffective . . . and render contribution pointless." *Nixon*, 528 U.S. at 297.

The Pennsylvania Supreme Court in *DePaul* recognized the distinction between an effective limitation and an impermissible ban. The Court found that the legislature had determined that large contributions from those connected with

the gaming industry were likely to result in the appearance of corruption, as evidenced in the legislative purpose of the statute, yet, in amending Section 1513, the legislature banned all contributions of any amount. Indeed, the legislature did little more than replace the word "large" with the word "any" and assumed this rendered the ban constitutional. While the *DePaul* Court did not foreclose the possibility that a wholesale ban may be appropriate, the Court concluded that the legislature had not determined that such an expansive ban was necessary to achieve the substantially important purpose. Of course, further legislative investigation could have shown cause why the purpose should be amended to include contributions of any size, yet no such showing was made. The Supreme Court has since reiterated that a limitation must be proportional to the interest served. *McCutcheon*, 572 U.S. at 218. Thus, contrary to the Commonwealth's interpretation, *DePaul* did not countenance a typographical amendment in place of a showing that the restriction was reasonable and proportional.

In order to be closely drawn, the specifics of the ban must hew closely to the needs of the actual legitimate governmental purpose: preventing *quid pro quo* corruption. The Supreme Court in *McCutcheon* did not hold that large contributions are inherently evil, but instead held that they are censurable because they have a demonstrable tendency to lead to corruption. This must be the actual goal and the actual effect of any abrogation of First Amendment rights. A

wholesale prohibition of contributions of any amount by citizens with even an attenuated connection to the gaming industry far exceeds the necessary scope of a prohibition seeking to eliminate corruption. For example, under Section 1513, a donation of $1 would trigger the prohibitions and penalties in the Gaming Act, yet there is at most an infinitesimal chance that a political candidate would be influenced by or even notice such a small amount. In this context, Section 1513's breadth is excessive. It strains credulity to conclude that a contribution of a single dollar from the beneficiary of a trust that owns a minority stake in a holding company that, in turn, owns a gaming licensee would give even the barest suggestion of a corrupt influence. Under Section 1513, however, this conduct would be subject to fines and penalties and perhaps criminal prosecution.

The court considers partially enjoining the ban, yet doing so would require undue intrusion into the purview of the legislature. The line at which "mere influence" transforms into corruption is an admittedly fine one. *See McCutcheon*, 572 U.S. at 209 ("The line between *quid pro quo* corruption and general influence may seem vague at times, but the distinction must be respected in order to safeguard basic First Amendment rights. In addition, '[i]n drawing that line, the First Amendment requires us to err on the side of protecting political speech rather than suppressing it.'" (quoting *Federal Election Comm'n v. Wisconsin Right to Life*, 551 U.S. 449, 457 (2007) (opinion of Roberts, C.J.)) It is the prerogative of

the Pennsylvania legislature to closely draw any future bans to achieve that purpose. The court holds only that the ban in its current form goes much further than necessary to achieve its stated purpose of eliminating corruption and the appearance of corruption. By way of example, the legislature may more strictly define who is subject to the ban, limiting its purview to those with close connections to the gaming entity that may seek to exercise corrupt influence over lawmakers, or the legislature may heed the implicit suggestion of the Pennsylvania Supreme Court that a limit on aggregate contributions may be the favored method of preventing corruption. *DePaul,* 969 A.2d at 553 ("A statute that limited the size of contributions, rather than absolutely prohibiting any contributions, would be more narrowly drawn to accomplish the stated goal."). As it stands, however, Section 1513 is unconstitutionally disproportional to the government's interest in preventing *quid pro quo* corruption or the appearance thereof and, accordingly, must be enjoined.

## III.    **Conclusion**

For the foregoing reasons, the court concludes that Section 1513 of the Gaming Act furthers a substantially important state interest, but is not closely drawn to achieve that interest.   Thus, Section 1513 is an unconstitutional abrogation of the First Amendment right to political association of Plaintiffs and those similarly situated.   Accordingly, the court will enjoin its enforcement.

 s/Sylvia H. Rambo
SYLVIA H. RAMBO
United States District Judge

Dated: September 19, 2018